ALEXANDER *et al. v.* HANCOCK.

(Division B. Dec. 9, 1935.)

[164 So. 772. No. 31822.]

484

Cooper & Thomas, of Indianola, for appellants.

**Allen & Allen** and **Moody & Johnson,** both of Indianola, for appellee.

Argued orally by **Forrest G. Cooper**, for appellant, and by **B. B. Allen**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

On August 24, 1926, J. N. Johnson, a resident of Washington county, and the owner of a large plantation in that

county and the adjoining county of Sunflower, made his last will, and some time later in that year died. Mr. Johnson was a widower, and had four daughters, but no sons. His estate was heavily indebted; and he provided by his will that the executor or trustee thereunder should first pay all debts secured by lien, expressly stating in his will that the "command for the payment of said indebtedness shall be superior and paramount" to any other bequest or distribution. He provided in the next place, and after the payment of said debts, that the net profits of the operation of the property should be distributed to his four children (leaving aside here the payment of two small monetary bequests) and that this distribution should continue during the natural lives of his said four daughters, and that if any one of his said daughters should die leaving children surviving her, then the children of said deceased daughter would receive in equal parts the parent's share of the net profits. In the third place, he provided that upon the death of the last survivor of his four daughters, and when the youngest of his grandchildren became of age, the property shall then be partitioned in fee simple among all the grandchildren living at that time, so that each grandchild should then have an equal interest in fee simple with each of all the other grandchildren.

For the purpose of the operation and management of the property and for the accomplishment of the objects of the testator prescribed in the will, he devised and bequeathed the entire property, real and personal, to his daughter, Mrs. Minnie Lee Alexander, as executrix and trustee. And he further provided that in case of her inability to serve, "then I hereby convey said property to my grandchild Lloyd C. Alexander, as substituted trustee and invest the said Lloyd C. Alexander, as trustee, with the same rights and privileges and impose upon him the same obligations, limitations and conditions as are herein imposed upon the original trustee. If both the original

trustee and the substituted trustee herein named predecease me, then I invest in the Chancellor of the Ninth Chancery District of Mississippi, the right, power and privilege to name another trustee provided the trustee so named is required to carry out the trusts herein imposed strictly; but the Chancellor of said court must name one of my children or grandchildren as such substituted trustee if possible to do so.''

Upon the probation of the will, Mrs. Alexander qualified and entered upon the discharge of the duties prescribed, and so continued until her death on February 11, 1934. Lloyd C. Alexander, named in the will to succeed his mother, had died on December 2, 1933. During the entire period of Mrs. Alexander's trusteeship she had had the active assistance of her husband, J. L. Alexander. In fact, during some of the time, Mrs. Alexander was in ill health, and during the last year of her life was bedridden. At the date of Mrs. Alexander's death important negotiations were under way for the refinancing of the remainder of the unpaid debts, which negotiations were then about to be consummated, and it was necessary to make an immediate appointment of a successor. Therefore, within a few days after her mother's death, appellant, Catherine Alexander, a grandchild of the testator, was appointed administratrix c. t. a. and trustee, and immediately entered upon the discharge of her duties as such. Thereafter, on February 22, 1934, the three surviving daughters of the testator, aunts of the appellant, filed their petition praying that the order appointing appellant Catherine Alexander be revoked, and that in her stead, the appellee, Nell Johnson Hancock, one of the daughters of the testator, be appointed. This petition averred in effect, that under the will it was the more proper to appoint a child of the testator than a grandchild, and that if the grandchild, Catherine Alexander, were continued in office it would mean that the management of the affairs of the estate would remain in the

hands of J. L. Alexander, as theretofore, and the petition made divers charges of misconduct against Mr. Alexander.

Answer was promptly made to this petition, and a hearing thereon was had, but the chancellor declined to order the removal of the appellant Catherine, and she continued in office. However, the family quarrel was on, and on November 9, 1934, appellee and her sisters renewed the contest, with the result, after several further hearings, that on December 21, 1934, the chancellor entered his order removing Catherine Alexander, the granddaughter, and appointing Nell Johnson Hancock, the daughter; and from that decree this appeal is prosecuted.

No opinion by the chancellor appears of record and no request for a finding of facts and the conclusions of law thereon was made of the chancellor, as should have been done under chapter 252, Laws 1934. It is asserted, however, in the briefs in behalf of appellant that in his oral opinion the chancellor stated that his decree was based upon the conclusion of law that a daughter must be preferred to a granddaughter. This assertion is denied in appellee's briefs, and besides, as we have often held, we cannot look to briefs to supply that which is not of record. But if the chancellor did proceed upon the conclusion of law aforesaid, then he was in error.

If we look to the terms of the will, as written, it will be noted that the testator directed that a successor trustee must be named from ''one of my children or grandchildren, if possible to do so.'' There is no significance in the fact that in this language the word ''children'' first appears. This is no more than a natural sequence in expression. And this is particularly true here, because in the very same item in which this expression is used a grandchild had been specifically named as a successor, in preference to children. Therefore, so far as the wording of the will is concerned, children and grandchildren

were brought together into one class out of which a successor should be selected.

It will be noted that the item of the will, which prescribes that the chancellor shall select a successor from among the children or grandchildren, if possible to do so, is preceded by the single provision that this is to be the procedure "if both the original trustee and the substituted trustee herein named predecease me." There is no provision as to what shall be done in case either of those named shall survive the testator, as has actually happened. No point as to this has been made in the argument for either side, and we assume that both sides have considered, and have been willing to abide by the construction, which all parties in interest in the estate have seemed to adopt, that the will is controlling as to the persons from whom the successor appointment shall be made, in spite of the technical omission in the language thereof to which we have referred. Neither side has suggested anything with reference to the general rules of equity upon the general subject of successor trustees, perhaps with the thought before them that if such rules were invoked it might result in a declaration by the court that none of the present parties, but an entirely disinterested, competent person, should be appointed. The entire argument by both sides has been that the general rules of probate should be applied to the determination of the successors from among the children and grandchildren, and so far as the particular appointments now under review are concerned, we shall not now or hereafter examine or adjudicate except under the rules which the parties have in their present presentation thus invoked.

Under probate rules it is "settled that the party entitled to the estate is entitled to the administration, and that where there are several distributees, the one entitled to the largest share in the estate is entitled to the administration." Langan v. Bowman, 12 Smedes & M. 715,

717. See, also, Jordan v. Ball, 44 Miss. 194. As a corollary of the rule just stated, it follows "as a further general rule that the residuary legatee is preferred in the appointment before all other persons;" and where an estate is devised for the benefit of certain persons during their lives with remainder over in fee, the administration with the will annexed should be granted to the remaindermen. 24 C. J., pp. 1161, 1162, and cases cited notes 32 to 37; and see note 1 A. L. R., p. 1253.

Applying the stated probate rules, the appellant Catherine should have preferred because she has a larger interest than her aunt, the appellee. Appellee and her sisters have no interest whatever in the lands or the other property as such. Their only interest is in a division of the net profits of the operation thereof after the payment of the debts as specified, whereas Catherine is a remainderman, which remainder will become a fee-simple title upon the happening of the events hereinabove mentioned. In the meantime, Catherine is also a distributee, along with her aunts, in the net profits, having come into that right by the death of her mother, as we have already pointed out.

Proceeding to the merits upon the facts and to the further facts, we are of the opinion from all the facts disclosed in this record, and so far as thus disclosed, and this is all upon which we can act here, that the appellant Catherine should have been preferred, and that it was error to remove her in favor of her said aunt. The undisputed testimony shows that J. L. Alexander was the manager of this plantation property during the last years of the lifetime of the testator, managing it under the direction of the testator. It is therefore of the most persuasive significance, that when, just before his death, the testator made his will, he specifically named his daughter, the wife of J. L. Alexander, to be the trustee, and named as her successor, her son Lloyd C. Alexander, the son of J. L. Alexander. The ability of J. L. Alex-

ander as a farm manager is not disputed in this record and apparently could not be, for the facts are that for the year 1926, the last year of the testator's lifetime, the plantation produced eight hundred bales of cotton. The next year, which was the first year of Alexander's management, under his wife, the property was submerged by the great flood of that year, so that only fifty bales were produced; but the years 1928 and 1929 were normal years, such as 1926. In 1928 Alexander produced one thousand eight bales, and in 1929, one thousand forty-eight bales. The year 1930 was the drought year; and 1932 was a year in which crops were ruined by prolonged rains. No data in terms of bales is furnished in the record for 1931, but for 1933, a normal year, Mr. Alexander produced six hundred bales after plowing under one-third the crop under the federal farm legislation of that year, in other words, a crop of nine hundred bales. In every one of these normal years Mr. Alexander did better than did the testator in his last year, 1926. The testimony further shows, without dispute, that Mr. Alexander is successful in securing and keeping tenants, there being about sixty tenants on the property, no land lying idle because of want of tenants, and that he has always been able to handle his tenants without trouble with them either as to their work or in settlements with them—a most important matter in the management of such a large plantation property.

When this property was taken over by Mrs. Alexander as trustee in the latter part of 1926, the entire property, real and personal, including insurance, was estimated at the total value of two hundred sixty thousand nine hundred fifty-three dollars and forty-four cents. Against it there were debts, according to the best that we can make out from this record, of about two hundred ten thousand dollars. Of this amount the Alexanders have paid approximately one hundred thirty-five thousand dollars, leaving a balance due of approximately seventy-

five thousand dollars, which balance they had succeeded in refinancing upon long terms of annual payments, so that henceforth these annual payments could be made and then have left, in normal years, a considerable net revenue to be distributed to the designated distributees under the will. It is true that some seventy thousand to eighty thousand dollars of the amount paid on debts came from life insurance and bills receivable, but there was a large balance of amount paid on debts and interest on debts that was made out of the crops produced, and this in the face of the most disastrous financial conditions with which this country was ever confronted, the price of cotton for 1930, 1931, and 1932 being but little more than sufficient to pay the cost of production. This property was kept going with heavy ad valorem taxes to pay, enormous sums in interest, with floods, and droughts and prolonged rains and bank failures everywhere; and yet it has steadily paid down its debts until now it is in comparatively easy financial condition, when at the same time similar properties throughout that whole area were being foreclosed and lost to their owners.

It is true that the Alexanders made some mistakes. One of these was that each of the daughters of the testator was not furnished at the close of each year's business with a full, complete, and entirely intelligible statement of all transactions, including receipts and expenditures, all in such detail and with such accompanying written explanations as that those statements could be well understood. Instead of this, they were remitted to the skeletonized annual accounts, abstracted from the books by the attorneys, and prepared and filed by the attorneys in court in such an obscure manner that even trained auditors were caused to misinterpret them and to gain the impression that gross irregularities had occurred. Another mistake was the attitude on the part of the elder Alexanders which we believe we are able to discern as a probability from this record, in apparently treating

this property as their own in so far as the other members of the family were concerned, in which connection we may say that this feature has caused the only serious hesitancy we have felt in proceeding to the decree which we shall hereinafter pronounce. In this latter connection, we have deemed it important to note, however, that the appellant Catherine, upon her appointment, took a different attitude and proceeded to make distributions to her aunts, apparently up to as large an amount as the prospects of the estate would stand, and she avers a cheerful willingness to continue that policy; whereas we find no declaration to that effect on the part of appellee, although, of course, this is a matter which the court has the power to control on being moved or petitioned thereto by any of the parties entitled.

But addressing ourself further to the matter of mistakes made, we must not forget that in the years of the management by the Alexanders they handled, in total of items of income and expenditures, in excess of one-half million dollars, under almost unbearable difficulties. Had no mistakes been disclosed, looking backward instead of forward, the truth of this record would, on that account alone, be subject to instant challenge. But we look to the general average of the aggregate result. We defer to the philosophy of a great American who once said that the man who made no mistakes was no brother of his. But when all this enormous volume of business is scrutinized and the explanations and reconciliations made in behalf of the Alexanders are applied, there remain but two items in regard to which just grounds for actual censure may be found. One is that in February, 1931, Mr. Alexander sold cotton to the value of two thousand five hundred sixty-six dollars and eighty-seven cents and applied the proceeds to his personal account, and did not furnish the data to the bookkeeper to be charged against him until September following. At that same time, however, the estate was indebted to Mrs.

Alexander in a sum in excess of eight thousand dollars; and in view of the unity with which Mr. Alexander and his wife worked throughout these years, we do not agree that this transaction is to be regarded with the seriousness urged by appellee. The other item is one of about one thousand five hundred dollars, as best we can tell from all the elaborate array of accounts and figures upon that subject, which represented the aggregate of a bonus paid to Mr. Alexander by a gin company. Without going into this matter in detail, as this opinion is already overlong, we deem it sufficient to say that in the minds of many laymen Mr. Alexander's claim of right to that money would be considered well taken, whatever lawyers and judges might think of it. And outside of the one item last above mentioned, it is not claimed, or certainly it is not shown, that a single penny belonging to the estate was not truly accounted for to the estate and shown on the books of the estate.

Catherine, the appellant, has lived on this plantation for the last sixteen years, being absent therefrom only when away at school. She is now twenty-four years of age. She is thoroughly acquainted with this property and all its conditions and needs, and to some extent had aided her father and mother in the work during their illnesses. She has and will have the assistance of her father in its operations, and declares that she will consult with the court and with her father in every step she takes. She was in the office for nearly a year before her removal, and not one word is uttered throughout the entire record of the testimony which reflected adversely upon her management or conduct of the property during that year, and we have already mentioned her attitude in the matter of the distribution of profits, namely, to the fullest extent which the property and its debts will permit. On the other hand, the appellee, Mrs. Hancock, is only twenty-eight years old and during the last several years has not resided on the property and has lived away

from it. Her husband, thirty-five years of age, is without experience in the management of a large plantation, either in the Delta or elsewhere. For the last five years or more he has been engaged in the grocery business, in Tennessee and elsewhere, a considerable part of which time he has been a traveling salesman. It follows that whatever his general ability, his industry or his sincere intentions, he has no adequate training for the particular undertaking which the appointment of his wife placed upon him.

And there is another feature which as we see it involves, at least to some extent, nothing less than good faith. When the remaining debts on the property were refinanced in 1934 under the Alexander management, the Federal Lank Bank which made a large part of the loans, sent its investigator to thoroughly overlook the entire situation and he declined to recommend the loan unless assured, so far as such assurance could be given, that the Alexanders should continue in the management of said property, and Mr. J. L. Alexander was required personally to indorse the notes, which he did.

There is much else in this large record which we cannot pursue in detail, but upon a complete review of it, to which we have given the best attention of which we are capable, we repeat that we are of the opinion that the appellant Catherine Alexander should not have been removed as administratrix and trustee, and we hereby vacate the decree of removal as of the date when the mandate of this court shall be filed in the chancery court, and we hereby decree that from said date said Catherine Alexander shall be restored to her said office: and this cause is remanded for the purpose solely that the chancery court may require appellee to file her accounts and make proper settlement with the estate.

Reversed, decree here for appellant, and remanded with directions.

## On Suggestion of Error.

**Griffith, J.**, delivered the opinion of the court on suggestion of error.

If the state of facts averred in the original briefs of appellee or in her suggestions of error were borne out by the record as certified to us by the clerk, the original opinion would have been entirely different and would now be modified. But, as we read it, the record does not bear out the gravamen of the assertions of appellee. The truth is that upon the original consideration of the case we were obliged to practically disregard the briefs of both sides so far as the facts were concerned, and go laboriously into this volumninous record on an independent investigation of the facts, so far beyond the record did the briefs for both sides go. And the suggestions of error go further afield than did the original briefs, so far as concerns the facts actually shown by the certified record. We must decide cases on the facts shown by the record, not by assertions of fact made in briefs or suggestions of error, however sincere counsel may be in those assertions. Facts asserted to exist ought to, and must, be definitely proved and placed before us by a record thereof certified as required by law; otherwise we cannot, in law, know them.

And, as to the new suggestion now made that we should apply the rules of equity as appertains to the appointment of trustees, we dealt in anticipation with that very suggestion in our original opinion, and there stated that we would not, as between the present parties, entertain any subsequent argument or presentation along that line, and stated the reasons therefor, which it is not here necessary to repeat.

The suggestions of error were assigned to, and were examined by, another judge than the writer of the original opinion, as is usual under our rules, and, upon such

examination, it was determined to overrule the suggestions of error, and this writer was directed by the court to make this response thereto.

Suggestions of error overruled.