# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00009-COA

**DANTRAIL JACKSON A/K/A POLE**                               **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/29/2021 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH III |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT GREER WHITACRE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND RENDERED - 10/10/2023 |
| MOTION FOR REHEARING FILED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1. Dantrail Jackson was convicted of the murder of Myrtle Messenger by a jury in Coahoma County. He was sentenced to serve life imprisonment in the custody of the Mississippi Department of Corrections. On appeal, Jackson claims the trial court erred when it allowed a surveillance video to be admitted showing him and others fighting at an apartment complex hours before Messenger was shot and killed at her house. He also claims the evidence was insufficient to convict him of murder and that his conviction should therefore be reversed and rendered. We find that the evidence was insufficient for a rational juror to convict Jackson of murder and reverse and render his conviction. Because issue two

is dispositive as to this appeal, we declined to address the issue concerning the videotape.

## FACTUAL BACKGROUND

¶2.     On March 14, 2015, Myrtle Messenger (Messenger) was sixty-six-years-old living at 711 Poplar Street in Clarksdale, Mississippi. Messenger lived in the home with her husband, George Messenger, and their adult grandson Michael Messenger, who had lived with them since he was six months old. That night, Messenger heard a knock at the front door and was shot in the head when she opened the door. Her husband called 911 immediately and was standing next to his wife in the foyer of the home when police arrived.

¶3.     Clarksdale police officers arrived on the scene and found Messenger was deceased. They secured the scene and requested assistance from the Mississippi Bureau of Investigations.[1] Law enforcement began to search the surrounding area. In a lot next to an alleyway across the street from Messenger's home, officers found four individuals, one of whom was Dantrail Jackson.[2] After identifying the four individuals, officers ran a check to ensure no warrants or charges were outstanding. Finding none, Jackson and the others were released.

---

[1] The Mississippi Bureau of Investigations (MBI) is a professional criminal investigatory agency of the Mississippi Highway Patrol and is often called to assist law enforcement agencies in difficult investigations.

[2] Another one of the four individuals was identified as Terrance Jackson by Stephen James, an officer with Coahoma County Sheriff's Department. Detective Nicholas Walsh testified that Cedric Dukes signed a consent for the police to collect a known DNA sample, which was sent to Scales Laboratory for DNA testing and comparison to the DNA mixture found on the weapon used to kill Messenger. It is not clear in the record if Cedric Dukes was one of the individuals found in the lot off the alleyway although defense attorney alluded to a "Cedric Boots" in closing argument. The other individual was never identified.

¶4. After learning that Jackson might be a person of interest in Messenger's murder, the police went back to the alleyway. Jackson was no longer there, but the police discovered two firearms, a .357-caliber revolver and a 9mm semi-automatic Taurus pistol, and latex gloves a short distance from where they had originally found Jackson. Those guns and the gloves were found under debris in a brush pile and, although wet from inclement weather, were collected in evidence and sent to the Mississippi Crime Laboratory for testing. After testing, the crime laboratory determined that the .357-caliber revolver was the weapon that was used to kill Messenger.

¶5. Police learned that on the day of Messenger's murder, Jackson had an altercation with Michael Messenger. On this information, the police obtained a search warrant for Jackson's apartment at the Bennie Gooden Housing Complex ("BGHC"). They found Jackson in dark clothes sleeping in a living room chair. Gunshot residue tests were done on Jackson's hands and clothes. Jackson was later arrested and charged with murder. A Coahoma County grand jury jointly indicted Jackson and another individual, Connell Gray, with murder with an enhancement of committing a felony with a firearm.[3] The defendants' trials were severed. Connell Gray was convicted in December 2019. That conviction was affirmed by this Court on May 25, 2021. *Gray v. State*, 328 So. 3d 194, 200 (¶18) (Miss. Ct. App. 2021).

¶6. Jackson's trial occurred from November 15 to November 18, 2021. The State's first witness at trial was Kristopher Wingert, a crime scene investigator with the MBI. Wingert

---

[3] The charge of murder was in violation of Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). The firearm enhancement was in violation of Miss. Code Ann. § 97-37-37 (Rev. 2014).

arrived at the scene of the murder shortly after midnight. He testified that Messenger was found lying on her back in the foyer of her home. Her cell phone and glasses were found on the table in the living room off of the foyer. The storm door was propped "open," and the "wooden door was slightly ajar."[4] Wingert noticed a bullet wound on her neck and the projectile that had exited her upper back, ricocheted against the back wall of the foyer and came to rest next to her right hand. He recovered a "copper jacket" next to Messenger as well. Later, he was summoned to an alleyway across the street from the Messenger residence, and there he photographed the scene and recovered two pistols and latex gloves another officer had located. The pistols recovered were the 9mm pistol and the .357-caliber revolver previously mentioned.

¶7. The State's next witness was Michael Messenger. Michael was thirty-two-years-old at the time of trial and stated that he had lived with the Messengers, his grandparents, since he was six months old. Michael testified that on the date of the murder, he had been drinking and riding in a vehicle with his friends James Bryant and Roger Grace when they stopped and spoke to a woman named "Tootsie." While Michael was speaking to Tootsie, Jackson pulled up and said, "Bro, you're all in my old girl's face." Michael responded, "[I]t ain't nothing on that level." Because Jackson "kept on talking," they left and went to the BGHC. Jackson "came around" the BGHC and "started back on the same stuff, talking about the female." When Michael got out of the vehicle, Jackson pushed him down. At that point, Michael left.

¶8. The State next called Duane Messenger, the youngest son of George and Myrtle

---

[4] The photographs of the door do not depict any bullet holes in the door, indicating that Messenger was shot after she opened the door.

4

Messenger. On the date of Messenger's murder, Duane lived just a few houses down from his parents' home on Poplar Street. That evening, he went to the Messenger residence to "[take] [Messenger] [a couple of hot pockets] to eat." After returning home, Duane "heard a gunshot" and "jumped on the floor." Shortly thereafter, Duane "saw some blue lights shining through the window[,] [so he] got up and looked out the window and it looked like they were [at his parents' house]." Duane walked over to the Messenger residence "to see what was going on" and saw Messenger lying on the floor, but he was unable to speak to her. Duane further testified that he was not aware of any enemies or anybody who had a problem with either of his parents.

¶9. Nicholas Walsh, an investigator for the Clarksdale Police Department, testified next. Walsh was the first to arrive at the crime scene "around . . . 11 p.m." Upon arrival, Walsh "went through the gate of the front of the house and approached the front door." Walsh stated George Messenger "was standing in the door asking for help." Walsh went inside the home and saw Messenger "[lying] on the ground in what appeared to be a pool of blood." Walsh then "tried to render aid as best [he] could." While doing this, he "spotted what appeared to be a projectile laying next to [Messenger] on the floor." Walsh then took pictures of the scene. Shortly thereafter, Investigator Sledge, Investigator Stars, and Investigator Burton arrived on the scene. After midnight, MBI Investigator Charles Hayle arrived on the scene as well. Walsh testified he collected the projectile as possible evidence. At one point the investigation led Walsh away from the Messenger residence to the nearby alleyway, approximately "30 to maybe 50 yards" away. Walsh stated Coahoma County

5

Sheriff's Department deputies were standing near a brush pile after firearms were found in it. Walsh observed "some handguns . . . inside the brush pile." Walsh further testified that a couple of hours later, he went to the BGHC in search of Jackson.[5]

¶10.    The State also called Stephen James, who was employed with the Coahoma County Sheriff's Department at the time of the murder. James was dispatched to the Messengers' home and noted that the weather conditions that night were "[d]rizzling, light rain." After setting up the perimeter, James and another deputy "decided to walk down the alley . . . adjacent to the house" and encountered four young men "five feet maybe . . . [n]ot far" from a "brush pile." James and the other deputy had the men "l[ie] down on the ground" to detain them and search their outer clothing. They "pa[tt]ed [the men] down first and made sure they didn't have any weapons on them[,] and then [they] checked for warrants to see if [any of the men] were wanted." James called the sheriff's dispatcher and was advised that none of the men had any outstanding warrants. He then "released them and told them they could go." James testified that he only recalled two of the men's names, Dantrail Jackson and someone named Terrance. After releasing the men, James and the deputy returned to the crime scene to speak with other officers. James was told that "the guy [he] encountered was a suspect" so he returned to the alley with a Deputy Rucker. Jackson was already gone.

¶11.    While James and Rucker "were shining [their] flashlights, [they] shined it on [a] brush pile and got a reflection." Upon inspection, they discovered "two guns in the brush pile." This brush pile was "[j]ust a lot of debris, just sticks thrown on top of one another" with

---

[5] It is not clear from the record exactly how the police developed Jackson as a person of interest or a suspect in the death of Messenger.

6

"trash in th[e] area as well." From the brush pile, James stated there "was like a tree that was blocking the view but you will have to step back farther in the alley you could see directly to the Messenger's residence." James testified that the four men he encountered earlier had been "to the left of the brush pile . . . back farther . . . in the lot . . . to the left." James saw "two chromes of guns, a revolver and an automatic" were "[s]tuck inside" the brush pile. The State asked James if he developed a suspect that night. James responded he "didn't [himself,] but the other officers did." The suspect was Jackson. Another officer on the scene "gathered some information of where [Jackson] might be[,]" so James and some other officers went to the BGHC. "[B]etween 2:00 and 2:30[,]" they found Jackson, "sitting in a chair inside one of the apartments there with a black hoodie on [and] appeared to be [a]sleep or acting [a]sleep." Jackson was dressed in "black clothing, a black hoodie on, black pants" and had his eyes closed. James believed there was also "a female in the back" wearing pajamas.

¶12. On cross-examination, James testified that there were "a lot of spectators" at the scene that night. James stated that spectators were "not unusual" and that Messenger "was a popular lady around this area." The brush pile was "less than 30 yards" from the Messengers' house. The lot where he and the other deputy found the four men was "not far at all" from the alley, "like a driveway in the street." Finally, after showing James his police report, James admitted that he referred to one of the other individuals in the alleyway as Terrance Jackson. He did not have any record of the names of the other two individuals.

¶13. The State also called Charles Sledge, who worked as a detective for the Clarksdale

7

Police Department at the time of Messenger's murder. When Sledge arrived on the scene, he met with Detective Walsh and "helped them" secure the scene and "collect whatever evidence that [they] were able to collect at that point and time." Sledge did not enter the residence but instead searched the area and "interviewed people that were standing out." Sledge stated that his investigation led him to a nearby alley. Sledge testified that evidence was discovered in the alley, "about maybe 200 to 300 feet from the house." Sledge testified that after leaving the scene, he went to the police station. He also stated that he came into contact with Jackson at the station. Sledge identified the gunshot residue kit sample taken from Jackson at 3:55 a.m. on Sunday, March 15, 2015. Sledge testified that he also collected a "black hoodie type sweater" from Jackson at 4:24 p.m. Sledge stated that he had no knowledge as to whether the hoodie was washed before he received it.

¶14.    The State also called Willie Pole, property manager of the BGHC. Pole authenticated the surveillance video the police pulled for March 14, 2014. Jackson objected to the video because it depicted what happened after Michael left the complex when he was pushed down by Jackson. The court allowed the video to be admitted.

¶15.    Next to testify was Brittany King, who was dating James Bryant aka "Scoop" "off and on" in March of 2015.[6] Brittany testified that Scoop sometimes stayed at the BGHC. On March 14, 2015, she "ran upon" Scoop and Jackson arguing and "felt like [she] needed to stop it." She stated that Michael Messenger and Roger Grace were also present at the scene of the argument. Brittany got out of her car and told Scoop to "calm down and get in [her]

---

[6] Scoop died before the trial began.

8

car," which Scoop did. Brittany then "[took] him to get a fifth of Hennessy." After stopping at the liquor store, Brittany took him to Gasmart, and he got back into the car with Michael Messenger and Roger Grace. Brittany did not see Scoop again until around 8:00 or 9:00 p.m. that night, when she later met him at the BGHC. When Brittany was pulling into the parking lot at the BGHC, she stated that "a black SUV . . . pulled up next to [her] and two guys got out which was Dantrail Jackson and his acquaintance." Brittany said they went into the apartment where Scoop was staying and she witnessed Scoop and Dantrail "[get] into it." Brittany testified that Scoop knocked Dantrail out and took his gun. Scoop then walked outside and told Brittany to sit in her car and "stay in the car no matter what." Scoop and Brittany ultimately left the area together. Brittany testified that she believed she saw Jackson and Connell Gray at 1:00 or 2:00 a.m. driving down Highway 61 in a green Honda Civic. Specifically, she stated she saw "two individuals in the car; one in the passenger's seat and one in the driver's seat . . . [she saw] [Gray] driving." She stated she could not see who was in the passenger seat.

¶16.    The State next called Dr. Mark LeVaughn, who was employed by the State Medical Examiner's Office in Jackson. He was tendered as and accepted as an expert witness in forensic pathology. Another pathologist with the office, Erin Barnhart, actually performed the autopsy on Messenger, but Dr. LeVaughn read the report and "independently reviewed the case file." The autopsy was performed on March 17, 2015. Messenger, who was sixty-six years old, suffered "a close range gunshot wound to the right side of her neck."[7] The

---

[7] Close-range wounds are "defined by the presence of what's called tattooing or stippling," which is "little pinpoint speckle injuries on the skin that's produced by the gun

9

State introduced photographs of the autopsy which Dr LeVaughn reviewed. Jackson objected to the photos being entered into evidence because Dr. LeVaughn did not perform the autopsy or take the photographs. The trial court allowed the photographs to be admitted. Dr. LeVaughn testified that during the autopsy, "two - - uh, bullet fragments were recovered from the wound path in the neck." "The exit wound was a bit lower on the body than the entry wound" so the bullet "appear[ed] that it's going slightly downward through the body." Finally, he testified that in his opinion, "the cause of death of Messenger [was a] gunshot wound to the neck," and "her manner of death [was] homicide."

¶17. The State's final witness was Mark Boackle, who worked for the Mississippi Crime Laboratory as a forensic scientist specializing in firearms examinations. He was provided both guns, the 9mm pistol and .357-caliber revolver for testing and comparisons to the copper jacket found next to Messenger, the projectile found next to her hand, and a fragment that was recovered from the autopsy. In essence, he explained his testing was an effort to determine "whether or not a bullet or cartridge was fired in a particular gun to exclusion of all other guns." Boackle concluded the copper jacket was shot from the .357-caliber revolver but could not determine if the projectile or the metal fragment were shot from that gun. He testified the copper jacket is the "outside covering of a bullet," and that is the only part of the bullet that has contact with the barrel of a gun. The projectile and metal fragment did not touch the barrel as they exited the gun; therefore, there are no "class characteristics" that would allow a determination to be made as to which gun fired those. At the conclusion of

powder that hits the skin as it exits the barrel after the bullet."

Boackle's testimony, the State rested.

¶18. Jackson called numerous witnesses to testify in his defense, beginning with Charles Sledge, who had previously testified for the State. Sledge testified that he came into contact with Jackson at the Clarksdale Police Department, where he signed a voluntary consent form to have his DNA taken at 4:28 a.m. on March 15, 2015. Sledge obtained samples of his saliva, blood, and/or hair to determine DNA. The consent form was admitted into evidence without objection.

¶19. The defense next called Nicholas Walsh, who had also previously testified for the State. Walsh was asked about a "Consent and Authorization to Withdraw Blood, Hair and Saliva" for Cedric Dukes dated March 16, 2015. Walsh then authenticated several other consent forms which allowed DNA to be collected from Jamario Stacker, Tyrone Johnson, and Terrence Mitchell. Walsh testified that once the authorizations were signed, the samples were collected, sealed, and sent to the Mississippi Crime Laboratory. Walsh stated that Charles Hayle was responsible for delivering the samples to Scales Biological Laboratory in Brandon, Mississippi, but was unsure if he did.

¶20. The defense next called Chad Sugg, a forensic scientist for the Mississippi Forensics Laboratory. Sugg testified that he conducted an analysis and generated a report for the presence of gunshot residue on a gunshot residue examination kit collected from Jackson. Sugg tested Jackson's "PJ Mark" sweater and found no evidence of gunshot residue. Sugg also tested the adhesive tape taken from Jackson's hands, and no evidence of gunshot residue was found. On cross-examination by the State, Sugg testified that timing is important in

collecting gunshot residue kits. He stated that the gunshot residue kit taken from Jackson was completed at 3:55 a.m., nearly five hours after Messenger's murder. Further, Sugg opined that the activities of the person from whom the gunshot residue kit was taken could greatly deplete the existence of the gunshot residue particles, in particular whether that person washed their hands, put their hands in their pockets, or had their hands exposed to rain that day because the "adhesive lifts are going to be less likely to pick up particles due to the moisture." Additionally, he testified that gunshot residue particles are more difficult to be detected on clothing due to fabric particles being larger than gunshot particles. Finally, Sugg testified that even though the evidence he analyzed did not contain the presence of gunshot residue, it does not necessarily mean the individual never fired a gun.

¶21. The defense next called Jamie Richardson, a forensic scientist with the Mississippi Forensics Laboratory. Richardson was accepted as an expert in latent print examination. She testified that she was asked to examine two submissions for latent prints in Jackson's case. "Submission number 9 was one sealed cardboard gun box which contained one Taurus 9mm pistol model number PT92AF[,] . . . [a] sealed manila envelope which contained one live round[,] . . . and one sealed manila envelope which contained one partially rested magazine containing 13 live rounds each stamped MKE13SP and one live round that was stamped R-P9mm louver." Richardson testified that she did a "visual exam" on submission number 9 and "super glued each one of th[o]se items and then [she] further dusted them with black fingerprint powder and no latent prints of value were found." Richardson explained that this meant "[t]he items [had] been touched by somebody at some point but [she has] no way of

telling who touched them." Submission number 10 was "a sealed cardboard box which contain[ed] one Colt 357 Magnum Revolver with the serial number 63723J" with a "silver tone finish, brown brick brics." There was also "one sealed envelope which contain[ed] 4 live rounds that are each stamped Federal 357 Magnum; and one sealed manila envelope which contain[ed] one spent casing stamped Federal 357 Magnum; and one spent casing that is stamped NCCIR 38SPL." Richardson testified that she tested "all of the items" in submission number 10, just as with submission number 9, by "a visual exam" and "super glue[ing] each item[,]" and "process[ing] it with black fingerprint powder." Just as with submission number 9, Richardson found "no latent prints of value." In other words, "there [was] not enough to say that a specific person touched the item[s]."

¶22. On cross-examination by the State, Richardson explained that there are "four major reasons" that a print may not be left on an object. The first is "environmental[, a]nd that just means that due to the environment, it may prohibit or erase a print frequently." The second is "[i]f the item is super cold . . . [(so] there is a lot of moisture on there[)] . . . [y]ou may not be able to leave a print[.]" The third is the individual because "we all have different body compositions," and certain factors like sweating, dry hands, or touching one's face can affect a print. The fourth is "the actual item of evidence," such as its texture, coating, or handling. Richardson testified that an item being rained on "can be" an example of one of these factors but that leaving a print "still can happen" despite the four factors. Richardson stated that she has recovered prints from a gun before, but that "it is more rare." She also stated that getting prints from live rounds "is a little more rare." Richardson testified that just because she was

13

unable to find enough "friction ridge detail" of a fingerprint to make a comparison, it did not mean that "a specific person did not handle that object[.]"

¶23.    Finally, the defense called George Schiro, the director of Scales Biological Laboratory in Brandon, Mississippi. Schiro was accepted as an expert witness in forensic DNA analysis following a stipulation by the State. He testified that the Scales Laboratory would be sent "evidence items" that may have been collected at a crime scene; if they "suspect[ed] that there is DNA" on an item, they would examine it further. Schiro testified that the lab would determine how much DNA was present and "run that extracted DNA through a process where [they] can look at 16 locations of interest on the DNA molecule itself where there is a high degree of variability among individuals." In doing so, they would create a DNA profile that could be utilized to compare evidence items to a person of interest connected to the items. Schiro stated that in the murder of Messenger, two guns and two "latex type gloves" were brought to the lab for DNA analysis on March 18, 2015. Schiro testified that they were also given "referenced DNA samples" or "known samples," which are taken directly from an individual to analyze. He explained to the jury that from there, they would "analyze the evidence first and determine DNA that is present. Once [they'd] done that[,] then [they would] analyze the reference samples to see if those people are included or excluded as possible contributors of the DNA." In the case of Messenger's murder, the lab received DNA samples from Tyrone Johnson Jr., Jamarious Stacker, and Dantrail Jackson.

¶24.    Schiro testified that once the evidence was brought to the lab, he "swabbed different areas of the gun[s]." For the revolver, this included "the grip, the trigger, the trigger guard,

the hammer[,] and some cartridges that were in the revolver." From the pistol, Schiro stated that he "took two swabs from the grip, two swabs from [the] trigger guard, two swabs from the slide, one swab from the hammer[,] and two swabs from the magazine." Schiro also examined the gloves that were submitted by swabbing "the exterior on both" and "individually [the] inside of each glove." Schiro testified that he was "able to exclude Mr. Dantrail Jackson as being a contributor to [the] DNA" found on any of the items brought to the laboratory. In other words, Schiro "found DNA[,] but it wasn't [Jackson's]."

¶25. After receiving the instructions on the law from the trial court and hearing closing arguments, the jury found Jackson guilty of first-degree murder. He was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections.

¶26. He now appeals, arguing two issues. First, he contends the court erred by admitting the video surveillance of the BGHC depicting some of the fight between Jackson and Bryant after Michael Messenger had left. Second, Jackson claims the evidence presented by the State was insufficient to support his conviction of first-degree murder. Because it is dispositive of this appeal, we first address the sufficiency of the evidence.

**ANALYSIS**

¶27. We begin by addressing the unique nature of Jackson's case, particularly that this Court has previously reviewed the circumstances of Messenger's murder when addressing an appeal from Connell Gray—Jackson's co-defendant.[8] Jackson's and Gray's trials were severed and, thus, occurred at different times in front of different juries. Likewise, their

---

[8] *See supra* ¶5.

15

appeals are completely separate from each other. The record on appeal for each is based on the evidence that was presented at that particular individual's trial. We acknowledge that some evidence that was admitted at Gray's trial did not come into evidence at Jackson's trial. But this Court must decide the issues of Jackson's trial based on the evidence that was introduced at Jackson's trial alone. *See Rogers v. State*, 318 So. 3d 1192, 1196 (¶15) (Miss. Ct. App. 2021) (stating that an appellate court's review on direct appeal "is limited to the trial record" and that "[f]acts outside the scope of the record before us cannot be considered by us here" (quoting *Sandlin v. State*, 156 So. 3d 813, 819 (¶20) (Miss. 2013); *Phillips v. State*, 421 So. 2d 476, 483 (Miss. 1982))). We are bound by our oath and the very structure of the appellate court system to set aside what we may know from Gray's trial and only consider the issues in this case from the record on appeal created during Jackson's trial. *Mason v. State*, 440 So. 2d 318, 319 (Miss. 1983) ("Facts asserted to exist must and ought to be definitely proved and placed before us by a record, certified by law; otherwise, we cannot know them") (citing *Phillips v. State,* 421 So. 2d 476 (Miss. 1982)).[9]

¶28.    Jackson argues the evidence introduced at his trial which was used to convict him of murder, was legally insufficient and therefore, this Court should reverse and render his conviction. He also argues the verdict was against the overwhelming weight of the evidence. This Court will address Jackson's sufficiency argument only since it is outcome determinative. This Court applies a de novo standard of review to challenges to the

[9] *See also Branch v. State,* 347 So. 2d 957 (Miss. 1977); *Robinson v. State,* 345 So. 2d 1044 (Miss. 1977); *Shelton v. Kindred,* 279 So. 2d 642 (Miss. 1973); *Alexander v. Hancock*, 174 Miss. 482, 164 So. 772 (1935).

sufficiency of the evidence. *Tubwell v. State*, 359 So. 3d 249, 250 (¶5) (Miss. Ct. App. 2023) (citing *Sims v. State*, 329 So. 3d 528, 534 (¶20) (Miss. Ct. App. 2021)). In so doing, "this Court views the evidence in the light most favorable to the State to determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Benthall v. State*, 311 So. 3d 697, 703 (¶20) (Miss. Ct. App. 2021) (citing *Martin v. State*, 214 So. 3d 217, 222 (¶15) (Miss. 2017)).

¶29.    When we address a challenge to the sufficiency of the evidence, the question is not whether *this Court* "believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McCarty v. State*, 247 So. 3d 260, 268-69 (¶23) (Miss. Ct. App. 2017).

¶30.    "The role and function of an appellate court is materially different from the "role and function of the jury." *Id.* (citing *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983)). The Supreme Court routinely clarifies that "when a defendant challenges the sufficiency of the evidence or argues that the verdict is against the weight of the evidence, 'neither this Court nor the Court of Appeals assumes the role of juror on appeal. We do not reweigh evidence. We do not assess witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury.'" *Id.* (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)).

¶31.    In reviewing the sufficiency of the evidence, we "will reverse and render if the facts

17

and inferences favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt." *Melendez v. State*, 354 So. 3d 944, 952 (¶30) (Miss. Ct. App. 2023) (quoting *Smoots v. State*, 310 So. 3d 1184, 1189 (¶17) (Miss. Ct. App. 2020)).[10] To do anything contrary would offend the double jeopardy clause of the Fifth Amendment to the United States Constitution and, consequently, the due process clause of the Fourteenth Amendment to the United States Constitution. *Greene v. Massey,* 437 U.S. 19, 24 (1978).[11] "[T]he Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient[.]" *Burks v. United States*, 437 U.S. 1, 18 (1978). Therefore, "the only just remedy available for th[is C]ourt is the direction of a judgment of acquittal." *Id.* (internal quotation marks omitted).

¶32.    The State produced no eyewitnesses to the crime.  The State produced no physical evidence tying Jackson to the scene of the crime or its commission.  The State's case rested entirely on two pieces of circumstantial evidence: motive and proximity.  First, Jackson had a motive to kill Messenger because her grandson Michael talked to his girlfriend on the day of the murder, and Jackson confronted him about it.  The State also argued Michael's friend,

---

[10]  *See also Serfass v. United States*, 420 U.S. 377, 387-88 (1975); *United States v. Jorn*, 400 U.S. 470, 479 (1971); *Ward v. State*, 285 So. 3d 136, 140 (¶14) (Miss. 2019).

[11]  *See also Kelly v. State*, 80 So. 3d 802, 804 (¶8) (Miss. 2012) ("The constitutional protection at issue, commonly known as the double-jeopardy clause, is enforceable against the states through the Fourteenth Amendment. Its protection prohibits, inter alia, multiple punishments for the same offense") (quoting *Boyd v. State*, 977 So. 2d 329, 334 (¶15) (Miss. 2008)).

while Michael was not even present, knocked Jackson out and took his gun.[12] Second, Jackson was close to the crime scene with three other individuals when the police arrived and the gun used to kill Messenger was later found in close proximity to where those four individuals had been standing.[13] "Of course, no precise rule can be formulated to simplify the question of what constitutes believable circumstantial evidence sufficient to support a verdict." *Bennett v. State*, 374 So. 2d 803, 805-06 (Miss. 1979) (citing *Fortenberry v. State*, 216 Miss. 243, 62 So. 2d 325 (1953)). The circumstantial evidence in this case was more an inference than evidence. Previous cases decided by the supreme court guide this conclusion.

¶33. In *Washington v. State*, 155 Miss. 404, 124 So. 480-81 (1929), Washington was convicted of first-degree murder. After a night of gambling, Washington's co-defendant, Henry Taylor, aimed a gun at the group and demanded they pay him the money that was owed to him. *Id.* at 481. Washington, apparently trying to escape for his own safety, left the house by way of an open window. *Id.* Taylor left the house carrying the gun. *Id.* Shortly thereafter, the decedent drove away with two other individuals in his car. *Id.* The two passengers testified that they passed Taylor walking on the side of the road and, as they

---

[12] No one testified that Jackson was so mad that he said he would kill or set out to kill Michael or Messenger, who was in no way involved in any conflicts that day. The State's motive is apparently inferred from Jackson being angry that Michael was speaking to his girlfriend.

[13] It is important to note that the police left the location where the four individuals were and later returned to that area after Jackson had left and then located the gun used in the killing. The police did not locate the gun when Jackson or any other individual was actually present in that area. The exact amount of time the "brush pile" was left unattended after the police left is not in the record. We know Jackson did not have the gun on him when the police first discovered him in the alleyway, as the officer testified all four individuals were searched and found without weapons.

passed him, two shots were fired. *Id.* Their car subsequently crashed because the driver had been shot in the back of the head and killed. Two other witnesses testified that, just before the murder, they saw Taylor and Washington together, both armed with guns and walking back towards the home. Those witnesses stated that they overheard Taylor say to Washington, "Let's go down there and get our money, or kill those '_____.'" *Id.* Based on these facts, a jury found Washington guilty of first-degree murder. *Id.* at 480.

¶34. On appeal, Washington argued the evidence was "wholly insufficient" to support a guilty verdict. *Id.* at 481. The supreme court agreed, holding that there was "no direct testimony to show that the appellant was at the scene of the shooting." *Id.* The only thing tying him to the shooting was his being seen walking in that direction a few minutes prior. *Id.* The spot where Washington was seen was near his own home and he was traveling in the "direction of a relative when he saw Taylor." *Id.* The court explained, "The evidence and the reasonable inferences . . . tend to establish the fact that the meeting between [Washington] and Taylor on the public road was purely accidental." *Id.* Further, there was no evidence of a conspiracy between the two men "prior to the time they met on the public road[.]" *Id.* In short, the conviction rested upon "largely circumstantial" evidence and the court reversed and "discharged" Washington of the conviction. *Id*. at 482.

¶35. In another case, the Mississippi Supreme Court addressed proximity as circumstantial evidence relating to the sufficiency of the evidence to support a conviction. *Conner v. State*, 138 So. 3d 143, 148 (¶8) (Miss. 2014). In that case, a victim entered her bedroom to find an unidentified male in her home. *Id.* at 147 (¶3). The male immediately fled the scene in a

20

"small, dark automobile parked in an adjacent driveway[.]" *Id.* The victim called authorities with a description of the vehicle; a vehicle matching that description was spotted "[w]ithin approximately one minute of the dispatch[.]" *Id.* at (¶4). The vehicle crashed and the driver was arrested. The victim identified the driver through a photographic line-up as the male she had encountered who was unlawfully in her home. *Id.* at (¶5). The driver, Conner, was indicted and convicted of felony fleeing, amongst other crimes. *Id.*

¶36.    This Court affirmed Conner's conviction due to his proximity to the scene of the break-in. *Id.* at (¶2). The supreme court stated in Conner's case that the Court of Appeals' reliance on proximity alone as sufficient circumstantial evidence of guilt was "misplaced." *Id.* at 148 (¶9). In affirming Conner's conviction, the supreme court relied instead on other circumstantial evidence, such as the victim identifying Conner in a line-up, the victim's statement that he had fled in the direction from which the police ultimately encountered him, the description of Conner and the vehicle in which he fled, and footage of an officer's dash camera. *Id.* at (¶¶10-11). Additionally, the proximity was based upon a sighting of the getaway car approximately one minute after leaving the victim's home. *Id.* at (¶8). Conversely in Jackson's case, there was *no* other evidentiary proof of guilt other than proximity to the crime scene ("30-50 yards") and a tenuous motive.

¶37.    The State relied on an inferred motive that Jackson killed Messenger due to the conflict he had with her grandson earlier that day. The State coupled the motive argument with his close proximity to the scene and the weapon and asked the jury to infer that Jackson was so mad that he obtained another gun, went to Messenger's front door, and shot and killed

21

her. However, no one testified Jackson was "mad." No one testified that he was ever seen leaving the scene of the fight (the BGHC) and obtaining the .357-caliber revolver. No one testified he somehow arrived at the Messenger home without being seen, rang her doorbell or knocked on the door, killed her, and then stayed close to the scene after committing such a dastardly act. Despite the State introducing surveillance from the BGHC of the fight, there was never any footage of Jackson leaving the BGHC or arriving after the shooting later that night. No one testified Jackson ever admitted to participating in the crime.

¶38. More importantly, no one testified Jackson ever owned, possessed, or even touched the weapon that we know killed Messenger. There is also no evidence that Jackson possessed a second gun that night[14] or that he handled or fired the weapon that was used in this crime. It is nothing more than "rank speculation" that Jackson was tied to the gun at all. In fact, to the contrary, the defense proved through the Mississippi Crime Laboratory's employees and a private DNA testing laboratory hired by the State, that Jackson's fingerprint and DNA were not on the gun. Those same employees also testified that the DNA found on the weapon excluded Jackson as a contributor. Quite simply, no evidence puts the weapon used to kill Messenger in Jackson's hands.

¶39. In this case, tenuous motive and close proximity to a crime scene are not sufficient evidentiary ingredients for a murder conviction.[15] If they are, we have created a legal recipe

---

[14] King testified that after Scoop "knocked Dantrail out" in the altercation at the BGHC, Scoop "took [Jackson's] gun." This is the only gun we are ever given testimony about or evidence of Jackson holding.

[15] The dissent contends that circumstantial evidence has the same weight as direct evidence and the jury determines the weight of that evidence. While that is absolutely true,

for potential gross miscarriages of justice instead of convictions of the guilty with proof beyond a reasonable doubt. Anyone who is "mad" at a family member when any other member of that family is murdered and happens to be with friends near that murder scene could now be criminally liable for that murder under our law if more proof is not required.[16]

¶40. It should be noted that the State attempted to prove what happened in this trial by attempting to have Connell Gray testify. When Gray appeared before the trial court in Jackson's trial, he invoked his constitutional right not to testify. *See* U.S. Const. amend. V; Miss. Const. Art. 3, § 27. At Jackson's trial, the State could not control or prevent Connell's assertion of his right to remain silent and not incriminate himself.[17] While the State tried to have Connell's testimony presented to the jury, it was bound by the Constitution which provides fundamental and substantive rights to all citizens. Those rights attach at birth and

---

the legal issue in this case is not whether circumstantial evidence has a valid evidentiary value. The issue in this case is whether the evidence presented against Jackson was *sufficient* to support a conviction. This Court must perform its appellate duty and comply with the legally imposed standard of review as to the jury's verdict when the sufficiency of the evidence is at issue; that standard does not change based on whether the evidence is circumstantial or direct.

[16] In this case, "near" is defined as across the street, 30 to 50 yards in a lot off an alleyway where a person can step around a tree and see the house where the murder occurred. This description is taken from multiple witnesses testimony.

[17] There are two possible maneuvers by the State in an attempt to alleviate a defendant's failure to testify. However, both maneuvers usually occur prior to Gray's trial. First, the State could have offered Gray a plea deal in exchange for his testimony at Jackson's trial. In fact, there is evidence in the record that the State attempted to do just that. However, Gray obviously declined to accept the plea deal, and he was subsequently tried and convicted by a jury. The only other possibility, prior to trial in an attempt to have Gray testify for the State, was to offer him immunity. However, to do that, Gray would escape any accountability for his role in the crime. Other than those two arrows in the State's quiver, it had no control over a defendant's assertion of their Constitutional rights.

cease to exist when we cease to exist. There is a legal difference between proving probable cause for an arrest by the police and evidence proving guilt beyond a reasonable doubt, which is necessary for a conviction. All trials and convictions are guided by evidence introduced at trial. The State cannot manufacture evidence. The State can only present witness testimony and physical evidence which is authorized by long-constructed, fair-minded rules of evidence.

¶41. The system created by our founding fathers protects all citizens, those guilty and those innocent. One such rule designed for the protection of our citizens places the burden of proof on the State to prove guilt beyond a reasonable doubt. But other rules of the system, at times, limit the State's ability to do just that. To further protect the citizens of this country, the admission of evidence in the criminal justice system is guided by rules of evidence balanced against the constitutional rights of the very citizens it seeks to protect. Here, Jackson received the benefit of those rules of evidence and those constitutional protections. As a result of our longstanding precedent concerning the sufficiency of evidence to prove guilt beyond a reasonable doubt, his conviction for murder must be reversed and rendered.[18]

---

[18] The Supreme Court has repeatedly reversed convictions where the only evidence proffered against the defendant was their proximity to the crime scene. *See Acuna v. State*, 54 So. 2d 256, 257 (Miss. 1951) (reversing where the only evidence against the defendant was that he stood in an alley behind the burglarized premises, looking suspicious); *Woolridge v. State*, 274 So. 2d 131, 133 (Miss. 1973) (reversing and "discharg[ing]" on the ground that the "state's entire case was based on circumstantial evidence"); *Shepherd v. State,* 403 So. 2d 1287, 1288 (Miss. 1981) (reversing and "discharg[ing]" a burglary conviction where the only evidence against the defendant was that he was found, holding a knife, while standing in an alley near the burglarized premises); *Rawls v. State,* 513 So. 2d 942, 944 (Miss. 1987) (reversing and rendering a burglary conviction where defendant's "sole connection with the burglary was that he walked around the side of victim's house, shortly after two other men who had carried away several unidentified objects");

24

While the State has a duty to investigate crimes and collect sufficient evidence, the result this Court reaches occurs not as a result of any particularized fault by the State, but because of the State's adherence to the very Constitution that created it and gave it power over its citizens but also sought to protect those citizens from that power. While it may seem to some that the system failed the cause of justice in this case; actually, it is proof that the criminal justice system is made of law and that law is to be followed to the benefit of all.

## CONCLUSION

¶42. Because the State failed to present sufficient evidence for a rational juror to tie Jackson to the murder of Messenger beyond a reasonable doubt, we reverse his conviction and render a judgment of acquittal in his favor.

¶43. **REVERSED AND RENDERED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, McCARTY AND SMITH, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, J.**

**EMFINGER, J., DISSENTING:**

¶44. The jury heard the evidence presented by the State and the defense, they were instructed on the law by the trial court, they heard the arguments of counsel, and they retired to deliberate and return a verdict. The twelve members of the jury then unanimously agreed that the evidence established, beyond a reasonable doubt, each of the elements of first-degree murder as required by the court's instructions. Accordingly, the jury returned their verdict:

---

*Corbin v. State*, 585 So. 2d 713 (Miss. 1991).

"We the jury, hereby, find the defendant <u>guilty</u>."

¶45.   The majority reverses Jackson's conviction and renders a judgment of acquittal in his favor. In effect, the majority finds that no "rational juror could have found the essential elements of the crime beyond a reasonable doubt." Yet the twelve "rational jurors" that were selected to hear this case did just that. Because I would find that the evidence presented, with all reasonable inferences drawn therefrom, was legally sufficient to support the jury's verdict, I respectfully dissent.

¶46.   In *Eubanks v. State*, 341 So. 3d 896, 909-10 (¶41) (Miss. 2022), the court repeated the familiar standard of review concerning the legal sufficiency of the evidence to support a conviction:

> "When reviewing a challenge for sufficiency of the evidence, this Court must determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor v. State*, 248 So. 3d 793, 796 [(¶8)] (Miss. 2018) (internal quotation marks omitted) (quoting *Ambrose v. State*, 133 So. 3d 786, 791 [(¶16)] (Miss. 2013)). "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id.* (internal quotation marks omitted) (quoting *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).
>
>> [I]f a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.
>
> *Id.* (quoting *Shelton v. State*, 214 So. 3d 250, 256 [(¶29)] (Miss. 2017)).

According to the standard, we must first view the evidence in the light most favorable to the prosecution. We must also give the prosecution the benefit of all reasonable inferences that

may be drawn from that evidence.[19]

¶47.    In the light most favorable to the prosecution, the evidence shows that Myrtle Messenger was shot and killed at about 11 p.m. on March 14, 2015, as she answered a knock on the door of her residence at 711 Poplar Street. There was no readily apparent reason for the murder. There was no evidence of an attempted robbery or even an attempt to enter the residence. Her husband, who was in the next room, called 911.

¶48.    Shortly after 11 p.m., law enforcement and EMS arrived at the Messenger residence to render aid and begin the investigation.[20] After a perimeter was established, two deputies decided to walk the adjacent alley, thinking it could have been the path the shooter used to leave the scene after the murder. The deputies encountered Jackson and three others in the alley. They searched the outer clothing of the four men and found no weapons on their persons. Then, after determining that the men had no outstanding warrants, they were released.

¶49.    However, when the deputies returned to the residence, they were advised that Jackson was a suspect in the murder. The deputies returned to the alley in an effort to find Jackson, but he was no longer there. They searched the area, and in a brush pile about five feet from

---

[19]  This requires this Court to focus on the evidence that supports a guilty verdict and not evidence opposed to that verdict when considering the legal sufficiency of the evidence. Further, we are not to consider what evidence was not presented to the jury that may have been present in the trial of Jackson's co-defendant in *Gray v. State*, 328 So. 3d 194 (Miss. Ct. App. 2021).

[20]  I use the term "shortly" because the record shows the sequence of the officers' investigation, but not the times of the various events. We can determine from the record that Messenger was murdered at about 11 p.m., and Jackson was ultimately found by law enforcement in an apartment, between 2 and 2:30 a.m. the following morning.

where the deputies had encountered Jackson and the others, the officers found two firearms and some gloves. One of the weapons was later determined to be the murder weapon.

¶50.    The brush pile was in the alley, about thirty yards from the Messenger residence. The Messenger residence was visible from the alley. According to the map introduced into evidence, the alley was in a direct path between the Messenger residence and the Bennie Gooden Housing Complex (BGHC), which was about five blocks away. As will be discussed below, this apartment complex was the scene of relevant events earlier that evening and was where law enforcement later arrested Jackson.

¶51.    The earlier events involved Michael Messenger Jr. (Michael). Michael lived most of his life with his grandparents, the Messengers, at the same address where Myrtle Messenger was killed. Earlier on March 14, Michael was riding in a car with James Bryant (Scoop) and Roger Grace. They pulled over on Madison Street, and Michael got out of the car and began a conversation with a female named Tootsie. At that point Jackson approached Michael and told Michael that he was "all in my girl's face." The implication was that Jackson was angry with Michael for talking to Tootsie. Michael testified he tried to calm the situation, but Jackson kept talking. According to Britney King, Scoop had gotten out of the car and became involved in the argument. Michael got back into the car with Grace, Scoop got into the car with Britney and they all left.

¶52.    Later, Michael, Scoop, and Grace got back together and went to the apartment complex. Michael was again approached by Jackson, who renewed his disapproval of Michael talking to Tootsie. This time, however, it turned more violent when Jackson pushed

Michael to the ground. Scoop witnessed this event. Michael testified that after again trying to calm Jackson down, Michael got into a car with a different female and left the apartment complex.

¶53. Britney King testified that around 8 or 9 p.m. that night, she met Scoop and Grace at the apartments. They saw Jackson and some of his friends walking towards the apartments. After discussing the earlier events, Britney testified that she and Scoop also went into the apartment. Once inside, Scoop and Jackson got "into it," and Scoop knocked Jackson out and took his gun.

¶54. Less than two hours later, about five blocks away, Myrtle Messenger was shot and killed as she answered a knock on her front door. The prosecution's theory of the case was that Jackson went to the Messenger residence to get revenge against Michael. Jackson was angry about the Tootsie situation and embarrassed that he got knocked out and had his gun taken from him. The prosecution told the jury that Jackson had a motive to get back at Michael and that this led to the murder of Michael's grandmother that night. The prosecution further argued that Jackson and three others were found within five feet of the murder weapon, less than thirty yards away from the Messenger residence, shortly after the murder.

¶55. The jury was properly instructed as to their duties as jurors, as to the necessary elements of first-degree murder, and as to accomplice-liability. After deliberation, the jury returned a unanimous verdict finding Jackson guilty of first-degree murder. This meant that all twelve jurors had found the circumstantial evidence sufficient for them to find, beyond a reasonable doubt, that Jackson "individually or while aiding and abetting and/or acting in

concert with another" killed Myrtle Messenger by shooting her with a pistol.

¶56. The majority disagrees with the jury's verdict and finds that the circumstantial evidence in this case was insufficient to find Jackson guilty beyond a reasonable doubt. The majority contends that "[i]t is nothing more than "rank speculation" that Jackson was tied to the gun at all." However, in *Bennett v. State*, 374 So. 2d 803, 805-06 (Miss. 1979), the supreme court stated:

> Of course, no precise rule can be formulated to simplify the question of what constitutes believable circumstantial evidence sufficient to support a verdict. Of necessity it must be approached from the factual circumstances of each case. . . . Numerous cases illustrate the tendency of this Court to leave factual issues in a "circumstantial evidence case" for the jury's resolution. *Bonnett v. State*, 317 So. 2d 907 (Miss. 1975), *Carter v. State*, 310 So. 2d 271 (Miss. 1975), and *Burge v. State*, 282 So. 2d 223 (Miss. 1973).

¶57. We have long recognized that "circumstantial evidence is not inferior to direct evidence when all of the facts are considered." *Bogard v. State*, 233 So. 2d 102, 105 (Miss. 1970). In *Cardwell v. State*, 461 So. 2d 754, 760-61 (Miss. 1984), we explained that "[c]ircumstantial evidence is entitled to the same weight and effect as direct evidence and this Court has upheld convictions based solely on circumstantial evidence."

¶58. For several years, the supreme court required that trial courts give a "circumstantial evidence instruction" in cases where there was no eyewitness and no confession. *See Moore v. State*, 247 So. 3d 1198, 1202-03 (¶21) (Miss. 2018). This instruction, arguably, in a circumstantial evidence case, placed a higher burden of proof upon the State than the usual "beyond a reasonable doubt" standard. In overruling the prior cases requiring the "circumstantial evidence instruction," the supreme court held in *Nevels v. State*, 325 So. 3d

627, 634 (¶20) (Miss. 2021):

> We expressly overrule *Moore*, 247 So. 3d 1198, and the circumstantial evidence instruction cases on which that opinion relies. *E.g.*, *Burleson*, 166 So. 3d at 509-11; *Kirkwood v. State*, 52 So. 3d 1184, 1186-87 (Miss. 2011); *Stringfellow*, 595 So. 2d at 1322. As Justice Robertson aptly put it, "the law should not impose a distinction between direct and circumstantial evidence where, at least in the present context, none rationally exists." *Mack*, 481 So. 2d at 797 (Robertson, J., concurring). Instead, the jury should be "instructed that the law makes no distinction between direct and circumstantial evidence but simply requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case." *Id*. Jurors should not be concerned about whether evidence is "direct evidence" or "circumstantial evidence." *They should consider and weigh all of the evidence presented. And* "[*i*]*f the jury is convinced beyond a reasonable doubt, we can require no more*." *Holland*, 348 U.S. at 140.

(Emphasis added). In rejecting the need for giving a special "circumstantial evidence instruction" the *Holland* court opined that both circumstantial and testimonial evidence are susceptible to the same strengths and weaknesses:

> Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. *If the jury is convinced beyond a reasonable doubt, we can require no more*.

*Holland*, 348 U.S. at 140 (emphasis added).

¶59.    The twelve jurors charged with weighing the evidence in this case were convinced beyond a reasonable doubt of Jackson's guilt, and *we should require no more*. As stated in *Eubanks,* I find that "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions" as to the weight of the circumstantial evidence in this case.

31

Accordingly, I would affirm the jury's verdict.

**GREENLEE, J., JOINS THIS OPINION.**